JPL:AAS
F.#2011R001786

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

QAYAAM FARROUQ,
MOHAMED GURMOHAMED,
    also known as
    "Nasir Gurmohamed," and
STEVE MASSIAH,

                Defendants.

- - - - - - - - - - - - - - - - X

**M 11-1134**

TO BE FILED UNDER SEAL

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF ARREST WARRANTS

(T. 18, U.S.C., §§ 1349
and 3551 et seq.)

EASTERN DISTRICT OF NEW YORK, SS:

    BRYAN J. TREBELHORN, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation (the "FBI"), duly appointed according to law and acting as such.

    On or about and between January 1, 2004 and February 27, 2009, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants QAYAAM FARROUQ, MOHAMED GURMOHAMED, also known as "Nasir Gurmohamed," and STEVE MASSIAH, together with others, did knowingly and intentionally conspire to execute a scheme and artifice to defraud a financial institution, to wit: Countrywide Home Loans, and to obtain moneys, funds, credits, assets, securities, or other property, owned by and under the custody and control of

1

such financial institution, by means of materially false and fraudulent pretenses, representations and promises, contrary to Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 1349)

The source of my information and grounds for my beliefs are as follows:

1. I have been a Special Agent with the FBI for approximately three-and-a-half years, and I am currently assigned to a financial institutions fraud squad, which investigates violations of federal criminal laws affecting financial institutions and other financial crimes. In this position, I have conducted physical surveillance, interviewed witnesses, reviewed extensive documents obtained through the service of subpoenas, and used other investigative techniques to secure relevant information for use in criminal prosecutions.

2. My knowledge of the information set forth in this affidavit is based upon my personal participation in this investigation and in numerous other investigations of fraud perpetrated against financial institutions, including bank and wire fraud, my review of records and reports, my debriefing of cooperating witnesses, my discussions with witnesses and victims, my conversations with other law enforcement agents involved in this investigation and similar investigations, my conversations

with and review of information provided by financial institutions, and my law enforcement experience and training.

3. Because this affidavit is being submitted for the limited purpose of establishing probable cause to support the issuance of arrest warrants, it does not include all of the facts I have learned during the course of this investigation. Where actions, conversations and statements of others are reported in this affidavit, they are reported in substance and in part unless otherwise indicated.

I. Introduction

4. The defendants QAYAAM FARROUQ, MOHAMED GURMOHAMED, also known as "Nasir Gurmohamed," and STEVE MASSIAH, together with others (the "Co-Conspirators"), defrauded various lending institutions (the "Lenders") by obtaining mortgages on properties (the "Properties") located in the Eastern District of New York and elsewhere through fraudulent means, including by falsifying mortgage loan applications and other documents. That false information made the borrowers appear to be more creditworthy and falsely enhanced the purported value of the Properties. As a result, the Lenders were fraudulently induced to issue mortgage loans secured by the Properties. The Co-Conspirators also fraudulently obtained fees and commissions in excess of those permitted by the Lenders.

3

II. The Defendants

5. The defendants QAYAAM FARROUQ, MOHAMED GURMOHAMED and STEVE MASSIAH were real estate agents licensed in the State of New York. FARROUQ, GURMOHAMED and MASSIAH all worked for a real estate company (the "Real Estate Company") in Queens, New York, which was owned by a Co-Conspirator ("CC1"). In this fraudulent scheme, the defendants posed as the purchasers of multiple Properties. The defendants generally had good credit scores, but lacked income and assets sufficient to secure multiple mortgage loans. Moreover, the defendants did not intend to inhabit or control the Properties. Instead, other Co-Conspirators were the true owners of the Properties purportedly purchased by the defendants.

III. The Fraudulent Scheme

6. The defendants and the Co-Conspirators prepared and caused to be prepared mortgage applications for the Properties purchased by the defendants. These mortgage applications contained numerous misrepresentations and material falsehoods designed to make the defendants appear more creditworthy. Among other things, the mortgage applications falsely inflated the bank account balances and income for the defendants. Additionally, the mortgage applications for the defendants falsely stated that the defendants would live at the Properties. In general, the Lenders provided more favorable

4

terms, including lower initial deposit requirements and lower monthly payments, to borrowers who intended to live in the Properties, as opposed to borrowers who were purchasing the Properties as investments.

7. As a condition for issuing the mortgage loans, the Lenders required the defendants to make down payments on the purchase of the Properties, and limited the amount that the Co-Conspirators could receive as real estate commissions and fees. Notwithstanding these requirements and affirmative representations in the mortgage loan documents that the defendants had in fact made down payments, the defendants often did not make any down payments, and the Co-Conspirators retained commissions and fees in excess of those permitted by the Lenders.

8. In many instances, the defendants failed to make mortgage payments to the Lenders, and the mortgage loans for the Properties went into default.

A. <u>The St. Albans Property</u>

9. Through the investigation, I have retrieved mortgage loan documents for a Property located St. Albans, New York (the "St. Albans Property"), purchased by the defendant QAYAAM FARROUQ on October 24, 2006. The amount of the mortgage loans was $381,600, and the lending bank was Countrywide Home Loans ("Countrywide"), which was insured by the Federal Deposit Insurance Corporation (the "FDIC").

5

10. The investigation has revealed that the mortgage application for the defendant QAYAAM FARROUQ includes numerous material misstatements as to his credit-worthiness. For example, the mortgage application falsely states that (1) FARROUQ earned $13,500 per month at the Real Estate Company, (2) FARROUQ was going to make a $10,000 down payment for the St. Albans Property, and (3) FARROUQ was going to provide a $33,481.21 cash payment to the sellers of the St. Albans Property at the closing. Additionally, the mortgage loan documents falsely state that FARROUQ intended to occupy the St. Albans Property as a primary residence. Moreover, the mortgage application includes a letter from FARROUQ to Countrywide in which he falsely stated that he was about to sell his then primary residence.

11. On August 16 and 25, 2011, I interviewed the defendant QAYAAM FARROUQ. During the interviews, FARROUQ admitted, in sum and substance, that he purchased the St. Albans Property together with another Co-Conspirator ("CC2") and that he never intended to occupy the St. Albans Property as a primary residence. Notably, CC2 is not listed as a borrower on the mortgage application. When asked about his credit information contained in the loan application, FARROUQ admitted that he had signed a blank mortgage loan application form. Furthermore, FARROUQ admitted that he did not make any down payments on any of the Properties he purchased.

12. Two cooperating witnesses ("CW1" and "CW2"), who have pleaded guilty to bank fraud charges arising from their participation in the mortgage fraud scheme detailed herein, and are cooperating with the government in the hope of receiving lesser sentences, have corroborated the statements of the defendant QAYAAM FARROUQ. CW1 and CW2, who both participated in the St. Albans Property transaction and knew FARROUQ both professionally and socially, recall that FARROUQ never intended to occupy the St. Albans Property as a primary residence. Both CW1 and CW2 also stated that the salary information in the mortgage loan application was inflated, in that FARROUQ earned far less than $13,500 per month. Additionally, records obtained pursuant to the investigation reflect that CC2 made at least one mortgage payment as to the St. Albans Property, and that FARROUQ received a check for $3,500 at the closing.

13. Real estate records reflect that, between October and December 2006, the defendant QAYAAM FARROUQ purchased three other Properties as primary residences. According to CW1 and CW2, FARROUQ never intended to occupy these other three Properties as primary residences. Notably, all three of the purchases were financed by Lenders other than Countrywide. Based on my training, experience, and knowledge of this investigation, I believe that FARROUQ purchased these Properties within a short time span in order to conceal the fact of the other pending

7

transactions from the Lenders. Absent this information, each of the Lenders provided more favorable terms, including lower initial deposit requirements and lower monthly payments. In particular, FARROUQ did not disclose to Countrywide that he had already purchased two other Properties during October 2006.

B. The Jamaica Property

14. Through the investigation, I have retrieved mortgage loan documents for a Property located in Jamaica, New York (the "Jamaica Property"), purchased by the defendant STEVE MASSIAH on March 16, 2007. The amount of the mortgage loan was $292,500, and the lending bank was Countrywide, which was insured by the FDIC.

15. The mortgage application for the defendant STEVE MASSIAH includes numerous material misstatements as to his credit-worthiness. For example, the mortgage application falsely states that MASSIAH earned $6,650 per month as a "catering manager" at a catering business (the "Catering Business"), which was owned by CC1. Additionally, the mortgage loan documents falsely state that MASSIAH intended to occupy the Jamaica Property as a primary residence. The mortgage application includes a certification of employment for MASSIAH, attesting that a "manager" at the Catering Business had verified that MASSIAH had been employed at the Catering Business since November 2002. The mortgage application also includes a letter by MASSIAH

8

falsely stating that he worked at the Catering Business and that he was moving into the Jamaica Property as a primary residence.

16. The investigation has revealed that the defendant STEVE MASSIAH never worked at the Catering Business, but rather was employed as a real estate agent at the Real Estate Company. On July 13, 2011, I interviewed MASSIAH, who stated, in sum and substance, the following: (1) he never worked at the Catering Business; (2) in March 2007, he was employed as a real estate agent at the Real Estate Company; and (3) he never intended to occupy the Jamaica Property as a primary residence. Additionally, MASSIAH admitted that he had purchased the Jamaica Property together with CC1. Notably, CC1 is not listed as a borrower on the mortgage application.

17. CW1 and CW2 have corroborated the defendant STEVE MASSIAH's admissions. CW1 and CW2 have informed the government that, at all relevant times to this Complaint, CW1 and CW2 knew MASSIAH both socially and professionally. According to CW1 and CW2, MASSIAH worked at the Real Estate Company, rather than the Catering Business, and never lived in the Jamaica Property. CW2 further informed the government that MASSIAH has purchased multiple properties on behalf of CC2. Additionally, a confidential source, who has previously provided reliable information ("CS1"), has informed the government that MASSIAH [~~CC2~~] never worked at the Catering Business.

9

18. Real estate records reflect that the defendant STEVE MASSIAH resold the Jamaica Property on May 1, 2007, approximately two months after the initial purchase. I have spoken with the purchasers (the "Purchasers") of the Jamaica Property. In sum and substance, the Purchasers stated that they have never met MASSIAH. Additionally, bank records indicate that MASSIAH never made any mortgage payments as to the Jamaica Property. Based on my training, experience, and knowledge of this investigation, I believe that the following facts suggest that MASSIAH acted as a straw buyer on behalf of CC1: (1) the Purchasers have never met MASSIAH, even during MASSIAH's resale of the Jamaica Property; and (2) MASSIAH never made any mortgage payments as to the Jamaica Property. Indeed, I believe that a seller who owns and resides in a property will typically meet the purchasers of such property on numerous occasions during the course of the transaction process. Moreover, I believe that purchasers of real estate properties who fail to make any mortgage payments generally lack intent to occupy such properties.

C. <u>The Ozone Park Property</u>

19. Through the investigation, I have retrieved mortgage loan documents for a Property located in Ozone Park, New York (the "Ozone Park Property"), purchased by the defendant MOHAMED GURMOHAMED on February 4, 2008. The amount of the

10

mortgage loan was $550,000, and the lending bank was Countrywide, which was insured by the FDIC. GURMOHAMED purchased the Ozone Park Property from a development company owned and operated by CC1.

20. The mortgage application for the defendant MOHAMED GURMOHAMED includes numerous material misstatements as to his credit-worthiness. For example, the mortgage application states that GURMOHAMED earned $6,974 per month as an employee at an auto body shop (the "Auto Body Shop"), and includes a pay stub and W-2 Form purportedly prepared by the Auto Body Shop. Additionally, the mortgage loan documents falsely state that GURMOHAMED intended to occupy the Ozone Park Property as a primary residence.

21. The investigation has revealed that the defendant MOHAMED GURMOHAMED never worked at the Auto Body Shop, but rather was employed as a real estate agent at the Real Estate Company. On September 21, 2011, I interviewed the proprietor of the Auto Body Shop (the "Proprietor"), who confirmed that GURMOHAMED never worked there. Additionally, the Proprietor admitted that CC1 had previously asked him/her to falsely certify to Lenders that prospective purchasers of Properties worked at the Auto Body Shop, when, in fact, they did not. Finally, the Proprietor stated that the pay stub and W-2 Form contained in GURMOHAMED's application are fraudulent.

22. Additionally, the investigation has revealed that the defendant MOHAMED GURMOHAMED never occupied the Ozone Park Property. On July 29, 2010, agents from the FBI interviewed the GURMOHAMED. During the interview, GURMOHAMED admitted that he then lived in the Bronx. CW1 and CW2, who both know GURMOHAMED socially and professionally, both confirm that GURMOHAMED has never lived at the Ozone Park Property. CW1, CW2, and CS1, as well as another confidential source who has previously provided reliable information, all confirm that, at all relevant times to this Complaint, GURMOHAMED worked at the Real Estate Company, and not at the Auto Body Shop.

23. The investigation has further revealed that, in February 2008 (the same month as the purchase of the Ozone Park Property), the defendant MOHAMED GURMOHAMED purchased two other Properties located on the same block of Ozone Park, New York as the Ozone Park Property. In both cases, the seller of these Properties was wife of CC1. Notably, both of these purchases were financed by Lenders other than Countrywide. Based on my training, experience, and knowledge of this investigation, I believe that GURMOHAMED purchased these Properties within a short time span in order to conceal the fact of the other pending real estate purchases from the Lenders. Absent this information, each of the Lenders provided more favorable terms, including lower initial deposit requirements and lower monthly payments.

WHEREFORE, your deponent respectfully requests that the defendants QAYAAM FARROUQ, MOHAMED GURMOHAMED and STEVE MASSIAH be dealt with according to law.

BRYAN J. CREBELHORN
Special Agent
Federal Bureau of Investigation

Sworn to before me this
17th day of November, 2011

HON. MARILYN D. G.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK